Affirmed by published opinion. Senior Judge HAMILTON wrote the opinion, in which Chief Judge WILKINS and Judges WIDENER, NIEMEYER, LUTTIG, WILLIAMS, MOTZ, TRAXLER, KING, and SHEDD joined. Judge LUTTIG wrote a concurring opinion. Judge WILKINSON wrote a dissenting opinion, in which Judges MICHAEL, GREGORY, and DUNCAN joined.
ON REHEARING EN BANC
HAMILTON, Senior Circuit Judge:
On August 5, 1994, Shawn Paul Hum-phries was convicted in the Circuit Court for Greenville County, South Carolina of murder, attempted robbery, possession of a firearm during the commission of a violent crime, and criminal conspiracy. Following a sentencing hearing, the jury recommended a sentence of death for the murder conviction and, in accordance with *209 the jury’s verdict, the state trial court sentenced Humphries to death for that conviction. After exhausting his state remedies, Humphries filed a petition for a writ of habeas corpus in the United States District Court for the District of South Carolina, 28 U.S.C. § 2254, which the district court dismissed.[1] On July 25, 2005, the district court granted Humphries a certificate of appealability, 28 U.S.C. § 2253. For the reasons stated below, we affirm the district court’s dismissal of Humphries’s habeas petition.
I
As found by the South Carolina Supreme Court on direct appeal, the facts of this case are as follows:
On January 1, 1994, Humphries shot Dickie Smith, the owner of the Max-Saver convenience store in Fountain Inn, South Carolina. The evidence at trial established that on the night before the killing, Humphries and his friend Eddie Blackwell drove around drinking beer. They also stole a gun that night. Shortly after 7:00 a.m. on January 1, they entered the Max-Saver convenience store. Smith, who was working in the store, asked Humphries whether he wanted something hot, and Humphries flashed the stolen gun and replied that he wanted money.
There was some evidence to suggest Smith then reached under a counter to pull out a gun. The video camera at the store recorded the shooting. When Smith reached under the counter, Hum-phries fired a shot in Smith’s direction and fled from the store. The bullet fired by Humphries struck Smith in the head, killing him. Meanwhile, Blackwell slumped to the ground in the store. The police arrested Blackwell at the scene and apprehended Humphries later that day.
State v. Humphries, 325 S.C. 28, 479 S.E.2d 52, 53 (1996).
On July 12, 1994, a Greenville County grand jury charged Humphries with the following offenses: (1) murder; (2) attempted robbery; (3) possession of a firearm during the commission of a violent crime; and (4) criminal conspiracy. On August 1, 1994, the case went to trial and the jury returned a verdict of guilty on all counts.
During the separate sentencing phase of Humphries’s trial, the solicitor proffered, and the state trial court admitted, all of the evidence that was admitted during the guilt phase of the trial. Following the court’s admission of this evidence, the solicitor called two witnesses from Dickie Smith’s family, his brother Randy Smith and his wife Pat Smith. These witnesses testified about Dickie Smith’s childhood, upbringing, work ethic, generosity, and close relationship with his young daughter Ashley.
Randy Smith testified that he and Dick-ie Smith grew up in a poor family that did not have hot water. When Dickie Smith was nine-years old, his father died. After his father’s death, Smith and the other family members began working to support the family. Randy Smith testified that, when Dickie Smith was in the ninth grade, he took a job after school as a meat cutter at a Bi-Lo grocery store, working until 10:00 or 11:00 p.m. at night. In the tenth grade, Dickie Smith acquired a full-time *210 job working second shift in a textile mill while continuing to attend school. Randy Smith testified everyone in the community liked Dickie Smith and he was a good person.
During her testimony, Pat Smith described Dickie Smith as ambitious, hardworking, and generous. For instance, after receiving one technical degree and becoming a supervisor, Dickie Smith went back to school to get his residential home builder’s license and began building houses in 1986. Ashley was born in 1988. Pat Smith described Dickie Smith and Ashley’s relationship as very close and testified that Ashley was having a hard time since her father was killed and was receiving counseling.
Following this testimony, the state moved to admit a photograph of the crime scene and documentary evidence demonstrating that Humphries was adjudicated as delinquent in 1985 for two breaking and enterings, convicted in 1989 in Anderson County, South Carolina of burglary and larceny, and convicted of larceny in Alabama in 1990.
In terms of making a case in mitigation, Humphries’s strategy was four-fold. First, he sought to establish that there was no intent to kill by demonstrating that: (1) he pulled the trigger after he panicked in reaction to Dickie Smith’s attempt to reach under the counter; (2) he did not kill Donna Brashier who was also in the store during the shooting; (3) he drove off without Eddie Blackwell; and (4) he voluntarily confessed to the killing. Next, Hum-phries sought to demonstrate that he was a nonviolent person who had no significant history of engaging in violent acts. He also sought to show that he was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, Humphries sought to show that he was a trustworthy, respectful, and pleasant person.
In support of this strategy, Humphries called thirteen witnesses. The first witness was Albert Humphries, Humphries’s paternal grandfather. He testified that Humphries and his brother, Richard Hum-phries, lived with him and Humphries’s grandmother from the time Humphries was three-years old until Humphries was twelve-years old. Albert Humphries testified that he and his wife were heavy drinkers and that his wife grew marijuana in their backyard. Albert Humphries described his son, Humphries’s father, as unpredictably violent, noting that he had been to prison several times. Albert Humphries testified that his son had cut him on the arm with a knife and had kicked Humphries’s grandmother in the face, knocking her false teeth out.
Patricia Goode, Humphries’s aunt, testified that Humphries’s father had said on numerous occasions that he never loved his children and that the children should have been aborted.
Humphries’s mother, Carla Scott, testified that, after she left Humphries’s father, she became pregnant with Humphries as a result of his father raping her at knife point. She stated that she eventually left the children with their paternal grandparents and married several more times. She reunited with the children only after she married someone who would allow the children to live with her.
Scott also discussed Humphries’s criminal record. According to Scott, Hum-phries was arrested in 1984 for two counts of breaking and entering and was placed on probation. Thereafter, he was given more probation after he was suspended from school for fighting several times. After Humphries’s second probation revocation when he was fifteen years old, he was sent to a state facility in Columbia, South *211 Carolina for thirty days and was placed on probation again. Humphries was arrested in January 1989 for breaking into a church, apparently looking for food because he had been living on the street for a week. Humphries pled guilty to that charge and was placed on probation. In 1990, Humphries was charged in Alabama with stealing an automobile. As a result of that charge, Humphries was sentenced to two years’ imprisonment followed by four years of probation.
Debbie Humphries, Humphries’s stepmother, testified that Humphries’s father used a combination of alcohol, drugs, and paint fumes every day and had shared those substances with Humphries from 1983 to 1992. Richard Humphries, Hum-phries’s brother, testified regarding the circumstances in which he and Humphries grew up, including: (1) their father’s violence toward his own parents; (2) the lack of hot water and sometimes running water; (3) the lack of food; and (4) the trips taken to the dumpsters to find school clothes.[2]
Preston Taylor testified that, when he was employed by the Department of Youth Services, he had numerous contacts with Humphries, who was thirteen at the time. According to Preston Taylor, Humphries was a pleasant, respectful, cooperative, and nonviolent boy.
Mary Shults, an expert witness with a degree in sociology and a master’s degree in social work, testified regarding Hum-phries’s social history. She related that Humphries had been reminded throughout his life that he was a product of rape. Shults stated that Humphries’s father was incredibly violent, would kick people in the face, cut people, and would refer to himself as Satan. In addition, Shults testified Humphries’s father introduced Humphries to drugs and alcohol between the ages of six and ten.
Humphries’s case in mitigation was closed with the testimony of three witnesses, two family friends (Tammy Compton and David Shaw) and his step-sister, Jamie Scott. Tammy Compton testified she trusted Humphries enough to leave her children with him and David Shaw testified Humphries was a good, nonviolent person. Jamie Scott testified she loved her step-brother a lot and wanted to see the jury return a life sentence.
Before the state trial court gave the jury its final instructions, the solicitor and counsel for Humphries gave their closing arguments. In his closing argument, the solicitor broke his argument down into four parts, commenting to the jury that
[y]ou look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated murder? You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they’ve presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.
The solicitor then turned his attention to the evidence in aggravation. The solicitor argued that the evidence in this case clearly established the statutory aggravating circumstance relied upon by the State, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon.[3] Then, *212 the solicitor turned to Humphries’s character and summarized Humphries’s checkered past in great detail, stating:
He’s been in trouble since he was 13 years old. When he was 13 years old, he committed two breaking and enter-ings, and he was given probation. He was given a chance by the Family Court judge at age 13.
He missed school. He got in fights at school. He got suspended at school. He ran away. And so they brought him back in at age 14 on a probation revocation, and he was given yet another chance, stricter conditions. And again, he skipped school. He ran away. He was disruptive in school. He got suspended.
So at age 15 he’s brought back in for another probation revocation. And this time the Family Court Judge said, “You know, enough is enough. We’re going to send you down to Columbia. We’re going to send you down there [to] see if we. can’t figure out what makes you tick.”
And they do all kind[s] of psychological reports and things that I’ll talk about in just a moment. And he comes back, and at age 16 is an habitual truant, and he basically drops out of school, and at age 17 he burglarizes the church and steals from the church, and he’s given probation.
And at age 18 he goes to Alabama, and he’s convicted of larceny down there, and he’s sent to jail for two years. And he gets out when he’s age 20, and at 21 he fails to report. They issue a warrant for him. He’s still on probation. And at age 22 he commits a murder and attempted armed robbery.
The solicitor then addressed the evidence in mitigation presented by Hum-phries. The solicitor argued to the jury that there was a complete lack of mitigating evidence, arguing that Humphries had a significant history of prior criminal convictions for crimes of violence and that his relatively young age (twenty-two), mental capacity, and occasional drug and alcohol use were of no moment.
Finally, the solicitor turned to Dickie Smith’s uniqueness as an individual. In this regard, the solicitor stated:
Dickie Smith was born in 1950, fourth son, fifth child of a fellow named Alton Smith and a sweet lady named Lottie Mae Darnell Smith. They grew up poor. They didn’t have hot water. They had a spigot coming in and a tub next to the stove, and they had a few acres of cotton.
Dickie Smith is as much about this case as Shawn Paul Humphries. When Alton Smith died when Dickie was nine, he pulled himself up by his bootstraps and he started contributing to the family. He got all kinds of odd jobs picking cotton at a penny a pound, hunting rabbits, skinning them, dressing them out, selling them for 50 cents.
When he’s 14 years old, he gets a job in Greenville at the Bi-Lo in the Meat Department working after school. He’s gone to school all day. From after school til about 10:00 or 10:30 at night working at Bi-Lo, saving his money, buying a car for the family.
When he’s in tenth grade, he goes down to Boenett’s and he gets a full-time job, second shift. He’s going to school all day, and he’s working until midnight, *213 contributing. Lottie Mae Darnell Smith with eight kids, got them all out of high school, all at least a tech degree, some of them through college.
When Dickie Smith finished high school, he went to work for Union Carbide, then Kemet, but he didn’t stop there. He kept improving himself. He went to Tech, he got an engineering degree, and he became a supervisor, and then he went back to Tech because he decided he wanted to build houses, and he got his — another degree at Tech, and he got his builder’s license.
And in 1984 he met Pat, and they fell in love, and they got married. That’s the same year Shawn Paul Humphries committed two house break-ins at age 13. In 1986 Dickie makes a pretty drastic move. He decides he’s going to quit Kemet and go build houses full-time, and he goes out, and he starts building homes in the community he had grown up in. That’s the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.
Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter- — -stepsister, said, “Please don’t put Shawn Paul Hum-phries in the electric chair.” I’m sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.
In 1988 Ashley is born. That’s the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the MaxSaver, building a business down in that community.
You have the right to look at the uniqueness of the individual. I would submit to you that Dickie Smith, by everybody’s description to you was a unique individual. He grew up in that southern part of Greenville County below Simpsonville that was mainly farming, cotton, agriculture area.
And he grew up watching it change to industrial. And he first went to work for one of the industries at Union Carbide, and then he decided he was going to be part of that change, and he started building houses down there and building a business down there.
After finishing the portion of his closing argument concerning Dickie Smith’s uniqueness, the solicitor then concluded his argument by arguing the following to the jury:
Who is the victim here, Shawn Paul Humphries or is it Dickie Smith? Who is the victim? Is it this guy over here or is it Donna, Donna Brashier, who’s got to hear that gunshot every day of her life and who’s got to see Dickie Smith laying on the floor every day of her life? Who is the victim? Is it this Defendant or is it this lady right here, his momma, or his wife, or Ashley, who the only way she can see her daddy is to go visit his grave on Sunday after church?
There are a lot of reasons for punishment. Rehabilitation is one reason, and rehabilitation is a proper goal in some circumstances, but you’ve got to decide about whether this Defendant, who at 13 is breaking the law, at 14 is breaking the law, at 15 is breaking the law, at 17 is going — is breaking the law, at 18 is breaking the law and going to jail, who’s been given every chance that the system offers. You decide if you’re going to rehabilitate him.
What are some other reasons for punishment? Retribution is a reason for punishment. That may not sound good, may not sound right, but,- in fact, it is part of punishment, because retribution is our community saying you have done *214 something wrong and we’re going to punish you....
When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances....
What punishment do you recommend when a man is defending his co-worker, he’s defending his store, he’s defending what he has built, and he’s ducking behind the counter, and somebody takes a nine millimeter and executes him? What punishment do you recommend? What punishment do you recommend when you’ve got a character like that? What punishment do you recommend when somebody like Dickie Smith is taken from us?
If not now, then when? If not in a case that’s as aggravated as this, then when do you do it? The defense may say, “Well, you can think of all kinds of aggravating cases.” You can think of this and you can think of that. You look at the circumstances of this case.
If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it? It’s not supposed to be easy. It’s never been easy. It won’t be easy in the future.
Shawn Paul Humphries comes into this courtroom asking you for mercy. Shawn Paul Humphries comes in here and asks you for mercy, and I ask you what mercy did he give? Shawn Paul Humphries comes in here and asks you for mercy, and he gave none. Shawn Paul Humphries comes in here and asks you for life, and he gave death. Is that fair? Is that justice? That’s what you’re here for is justice. It’s up to you.
In his closing argument, counsel for Humphries argued that the death penalty was unwarranted for several reasons. First, counsel for Humphries emphasized that there was no evidence of an intent to kill because Humphries: (1) pulled the trigger after he panicked in reaction to Dickie Smith’s attempt to reach under the counter; (2) did not kill Donna Brashier; (3) drove off without Blackwell; and (4) voluntarily confessed to the killing. Counsel also argued that Humphries was a nonviolent person who had no significant history of engaging in violent acts. Counsel argued that Humphries was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, counsel argued that Humphries was a trustworthy, respectful, and pleasant person.
Following the state trial court’s instructions and the jury’s deliberations, the jury recommended a sentence of death for the murder conviction and, in accordance with the jury’s verdict, the state trial court sentenced Humphries to death for that conviction.[4] At the post-trial motions hearing, Humphries’s counsel objected to the solicitor’s use of comparisons between Dickie Smith and Humphries during his closing argument, and the state trial court overruled the objection.
On direct appeal, the South Carolina Supreme Court affirmed the state trial *215 court’s judgment. Id. at 57. On June 9, 1997, the United States Supreme Court denied Humphries’s petition for a writ of certiorari. Humphries v. South Carolina, 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997).
On September 16, 1997, Humphries filed an application for post-conviction relief in state court, which he later amended. Following an evidentiary hearing, the state habeas court dismissed the application. On June 18, 1999, Humphries filed a petition for a writ of certiorari in .the South Carolina Supreme Court. On September 27, 2001, the South Carolina Supreme Court granted the petition for a writ of certiorari and requested the parties proceed with briefing. Humphries, through appellate counsel, briefed the following issue in his petition for certiorari: “Counsel did not provide petitioner effective assistance at sentencing because they failed to object timely to the solicitor’s closing argument suggesting that the petitioner deserved to die because his life ,was worth less than the victim’s.” The Supreme Court of South Carolina affirmed the state habeas court’s judgment on August 26, 2002. Humphries v. State, 351 S.C. 362, 570 S.E.2d 160, 168 (2002).
On December 24, 2002, Humphries filed a petition for a writ of habeas corpus in the United States District Court for the District of South Carolina. On January 29, 2003, the State filed a motion for summary judgment. Humphries filed his response on February 14, 2003. On February 25, 2003, a United States Magistrate Judge reported and recommended that Humphries’s habeas petition be denied. On June 19, 2003, the district court, after conducting a de novo review of the record, granted the State’s motion for summary judgment and dismissed the petition. On July 25, 2003, the district court granted Humphries a certificate of appealability, 28 U.S.C. § 2253.
On May 3, 2004, a divided panel of this court vacated Humphries’s death sentence and remanded the case with instructions to issue the writ solely for the purpose of resentencing. Humphries v. Ozmint, 366 F.3d 266 (4th Cir.2004). The State filed a timely petition for rehearing with a' suggestion for rehearing en bane to which Humphries filed a response. A majority of the active circuit judges voted to rehear this case en banc, which resulted in the vacatur of the panel opinion.
II
Our standard for collateral review of a state court’s decision on the merits under 28 U.S.C. § 2254(d) is well-settled. A federal court may not grant a writ of habeas corpus unless the state court’s adjudication of the claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). The phrase “clearly established Federal law,” id., “refers to the holdings, as opposed to the dicta, of the [Supreme] Court’s decisions as of the time of the relevant state-court decision.” Booth-El v. Nuth, 288 F.3d 571, 575 (4th Cir.) (internal quotation marks omitted), cert. denied, 537 U.S. 959, 123 S.Ct. 384, 154 L.Ed.2d 311 (2002). Further, a state court’s decision is “contrary to” clearly established federal law, as determined by the Supreme Court, either: (1) “if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,” or (2) “if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.” Williams v. *216 Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Finally, “[u]nder the ‘unreasonable application’ clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Id. at 413, 120 S.Ct. 1495. Notably, an “unreasonable application of federal law is different from an incorrect application of federal law,” because an incorrect application of federal law is not, in all instances, objectively unreasonable. Id. at 410, 120 S.Ct. 1495.
Ill
Humphries contends that his trial counsel were constitutionally ineffective when they failed to object to a portion of the solicitor’s closing argument at sentencing. According to Humphries, the State violated the dictates of Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), when the solicitor in effect argued to the jury during the sentencing phase of the trial that Humphries deserved the death penalty because Dickie Smith (the victim) was a worthy individual and an asset to the community while Humphx-ies was not. Humphries posits that, not only was his counsel deficient for failing to object, but also that he was prejudiced by this failure as well. To properly analyze Humphries’s Payne claim, we must take a close look at the Supreme Court’s precedent concerning victim-impact evidence.
A
In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that the Eighth Amendment prohibits a state from allowing a capital sentencing jury to consider victim-impact evidence. Booth involved the brutal murders of an elderly couple, Irvin and Rose Bronstein. Id. at 497, 107 S.Ct. 2529. During the sentencing phase of the trial, the prosecutor read a victim-impact statement that was compiled by a probation officer on the basis of her interviews with the Bronsteins’ surviving family members. Id. at 498-500, 107 S.Ct. 2529. The victim-impact statement included all three forms of victim-impact evidence: accounts of the emotional and psychological impact of the crime on the family, descriptions of the Bronsteins’ personal characteristics, and the victims’ family members’ opinions and characterizations of the crimes and the defendant. Id. at 499-500, 107 S.Ct. 2529.
In Booth, the Court held that all three forms of victim-impact evidence are irrelevant to a determination of whether to impose a death sentence, and that their admission thus risks arbitrary and capricious imposition of the death penalty. Id. at 502-03, 107 S.Ct. 2529. The Court noted that, because victim-impact evidence includes facts about which the defendant was unaware at the time of the murder, it is unrelated to the defendant’s culpability. Id. at 505, 107 S.Ct. 2529. The Court further noted that admitting victim-impact evidence would yield arbitrary results because victim-impact evidence would lead juries to impermissibly base their decision on their evaluation of the relative worth of the victim, and because the capital sentencing decision would partially depend upon the degree to which the victim’s family members — if the victim leaves any behind — are able to articulate their loss. Id. at 505-06, 107 S.Ct. 2529. Moreover, the Court stated that victim-impact evidence improperly shifts the jury’s focus from the defendant to the victim, and, thus, yields death sentences based on emotion rather than reason. Id. at 507-08, 107 S.Ct. 2529.
In South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 *217 (1989), the Supreme Court extended Booth to cover a prosecutor’s comments on the murder victim’s personal characteristics. Id. at 811-12,109 S.Ct. 2207. In that case, in an attempt to enable the jury to more fully comprehend the human loss involved in the murder of a mentally unstable homeless man, the prosecutor made various references in his closing argument at the sentencing phase about the- victim’s personality and character, including inferring from the victim’s possession of religious- articles and a voter registration card that the victim was a man of faith who eared about his community, reading a prayer written by the victim that was found at the murder scene, -and noting that the victim had mental problems. Id. at 808-10, 109 S.Ct. 2207. The Court found that the prosecutor’s statements were “indistinguishable in any relevant respect from that in Booth" and, thus, likewise violative of the Eighth Amendment. Id. at 811, 109 S.Ct. 2207. According to the Court, while victim-impact evidence relevant to the circumstances of the crime is admissible, the prosecutor’s statements went far beyond those facts. Id. at 811-12, 109 S.Ct. 2207.
In Payne, the- Court overruled both Booth and Gathers. The Payne case involved a brutal attack of a mother and her two small children that left the mother and one of her children dead. Payne, 501 U.S. at 812-13, 111 S.Ct. 2597. At the sentencing phase of the trial, the prosecutor presented the testimony of the children’s grandmother, who testified about the effect of the crimes on the now-orphaned child. Id. at 814-15, 111 S.Ct. 2597. Additionally, the prosecutor commented extensively on the impact of the murders on the orphaned child and said that the child will “want to know what type of justice was done” when he is older.- Id. at 815, 111 S.Ct. 2597.
In - the Payne decision, the Court observed that “a State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.” Id. at 825, 111 S.Ct. 2597. Furthermore, the Court observed that Booth “unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering ‘a glimpse of the life’ which a defendant ‘chose to extinguish,’ ” id. at 822, 111 S.Ct. 2597 (quoting Mills v. Maryland, 486 U.S. 367, 397, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (Rehnquist, C.J., dissenting)), or “demonstrating the loss to the victim’s family and to society which has resulted from the defendant’s homicide.” Id. Consequently, the Court concluded that, “if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.” Id. at 827, 111 S.Ct. 2597. Of note, the Payne Court did not ■ alter Booth’s holding that admitting evidence of the victims’ opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather Payne only allows evidence of the victim’s personal characteristics and the harm inflicted upon the victim’s family and community. Id. at 829 n. 2, 111 S.Ct. 2597. The Court in Payne noted that there was “no reason” to treat victim-impact evidence “differently than other relevant evidence,” id. at 827, 111 S.Ct. 2597, but cautioned that, “[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.” Id. at 825, 111 S.Ct. 2597.
*218 The Court in Payne did not set the parameters of what type of victim-impact evidence would render a trial fundamentally unfair under the Due Process Clause of the Fourteenth Amendment. AlS noted earlier, the Payne Court did observe that courts should handle the admission of victim-impact evidence just like any other relevant evidence. 501 U.S. at 827, 111 S.Ct. 2597. However, the only inkling in Payne on the limitations imposed on the admission of victim-impact evidence is the Court’s citation to Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Payne, 501 U.S. at 825, 111 S.Ct. 2597.
In Darden, the Court addressed prosecutorial misconduct at the guilt phase of a capital murder trial. In addressing Darden’s argument that his trial and resulting conviction were fundamentally unfair because of the prosecutor’s improper argument, the Court characterized the inquiry as whether the improper comments were so unfair as to make the conviction a denial of due process. Darden, 477 U.S. at 181, 106 S.Ct. 2464. The Darden Court based its due process standard on Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), another prosecutorial misconduct case. In considering DeChristoforo’s claim that his first degree murder conviction violated his due process rights, the Court stated that the due process analysis properly addresses more than just the questionable prosecutorial conduct itself. Id. at 639, 94 S.Ct. 1868. Instead, a court making a due process inquiry must consider the challenged conduct in relation to the proceeding as a whole. Id. The analysis of a due process claim premised on unfair prosecutorial conduct may thus depend upon numerous factors, which include the nature of the prosecutorial misconduct, Darden, 477 U.S. at 181-82, 106 S.Ct. 2464, the extent of the improper conduct, DeChristoforo, 416 U.S. at 645, 94 S.Ct. 1868, the issuance of curative instructions from the court, Darden, 477 U.S. at 182, 106 S.Ct. 2464, any defense conduct inviting the improper prosecutorial response, id., and the weight of the evidence. Id.; see also Boyd v. French, 147 F.3d 319, 329 (4th Cir.1998) (holding that a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court’s charge, and whether the errors were isolated or repeated). Based on this precedent, it is evident that both Darden and DeChristoforo apply to eases in which the defendant or petitioner alleges that the admission of victim-impact evidence or prosecutorial comment on victim-impact evidence violated his rights under the Due Process Clause of the Fourteenth Amendment.
B
In its decision on state habeas, the South Carolina Supreme Court first held that Payne only prohibited comparisons between the victim and other members (victims) of the community. Humphries, 570 S.E.2d at 167-68. Because no such victim-to-victim comparison was made in the case, the South Carolina Supreme Court held that Payne did not ipso facto prohibit the solicitor’s closing argument. Id. Because Payne did not specifically prohibit vietim-to defendant comparisons, the South Carolina Supreme Court went on to address the question of whether the solicitor’s argument rendered Humphries’s sentencing proceeding fundamentally unfair. The court did not view the solicitor’s argument as improper, let alone that it rendered Humphries’s sentencing proceeding fundamentally unfair. In reaching this conclusion, the court stated:
*219 In our opinion, the solicitor’s closing argument did not render sentencing fundamentally unfair as they [sic] did not prejudice Petitioner. The solicitor’s comments were based on evidence already in the record. Smith’s wife and brother testified during the penalty phase regarding each of the facts about Smith’s life upon which the solicitor commented. Petitioner presented the testimony of thirteen witnesses in mitigation during the sentencing phase who attested to Petitioner’s at-risk childhood and subsequent criminal acts as a juvenile and young adult, providing all the evidence of Petitioner’s character discussed by the solicitor in his closing.
Through the testimony of Petitioner and Smith’s family members, both the similarities (the childhood poverty and .adversity) and the differences (the manner in which Petitioner and Smith dealt with their circumstances) were readily apparent to the jurors, before the solicitor’s closing argument. As permitted by Payne, the State offered evidence of Smith’s “uniqueness” as an individual by describing the successful ways in which Smith dealt with adversity in his life. Likewise, Petitioner introduced evidence of his own “uniqueness” through the testimony of thirteen witnesses (compared to Smith’s two witnesses) regarding his own difficult childhood and background, thereby inviting a comparison between Petitioner and Smith’s respective charT-acters even before the solicitor gave his closing remarks. As such, we do not believe the solicitor’s comments were so prejudicial (if prejudicial at all) that they rendered Petitioner’s death sentence fundamentally .unfair under the Due Process Clause.
To reverse the PCR court’s denial of relief, this Court must find, first, that counsel was ineffective, and, second, that counsel’s ineffectiveness resulted in prejudice. Payne does .not prohibit character comparisons between defendants and victims; it prohibits comparisons that suggest that there are worthy and unworthy victims. Therefore, Petitioner cannot establish either the ineffectiveness prong or the prejudice prong of the test as required to overturn the PCR court’s denial of relief.
Humphries, 570 S.E.2d at 167-68.
C
As noted earlier, Humphries claims that the solicitor’s closing argument at the sentencing phase of the trial, taken as a whole, in effect asked the jury to impose the - death penalty because Dickie Smith was a worthy individual and an asset to the community while Humphries was not. According to Humphries, such comparative worth arguments run afoul of the dictates of Payne and the Due Process Clause of the Fourteenth Amendment and, therefore, his trial counsel were constitutionally ineffective for failing to. object to. the solicitor’s closing argument.
In advancing his argument, Humphries does not posit that any one of the solicitor’s comments, standing alone, was improper or factually inaccurate. Thus, his collectivity argument focuses on a few of the solicitor’s comments, which he contends created an impermissible situation in which the solicitor asked for a sentence of death based solely on the relative worth of his life and the life of Dickie Smith. In particular, Humphries objects to the year-by-year chronology, wherein the history of his life was compared to the history of Dickie Smith’s life.[5] Humphries also takes *220 issue with three statements made by the solicitor near the end of his closing argument which, when coupled with the year-by-year chronology, allegedly rendered the solicitor’s argument constitutionally infirm. The statements are: (1) “[WJhen you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances ”; (2) “What punishment do you recommend when you’ve got a character like that? What punishment do you recommend when somebody like Dickie Smith is taken from us?’K, and (3) “If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it?”
We conclude that the South Carolina Supreme Court did not unreasonably apply Payne when it held that the solicitor’s closing argument at the sentencing phase of the trial, taken as a whole, did not render Humphries’s sentencing proceeding fundamentally unfair. First, the record in this case simply belies Humphries’s claim that the solicitor’s comparison of the lives of both Humphries and Dickie Smith was the centerpiece of the solicitor’s argument. It was not. As set forth above, the solicitor’s life history comparison contained in the year-by-year chronology essentially was the manner in which the solicitor chose to present to the jury the argument that Dickie Smith was a unique individual. Within that year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) “Dickie Smith is as much about this case as ... Hum-phries”; (2) Humphries “committed two house break-ins at age 13”; (3) in 1986 Humphries violated the terms of his probation and was “sent down to Columbia”; and (4) in 1988 Humphries went to prison for two years. The bulk of the solicitor’s argument was not that Humphries should die because his life was worth less than Dickie Smith’s. Indeed, the solicitor did not use the words “worth,” “comparative worth,” or “value” in his year-by-year chronology. Rather, the bulk of the solicitor’s argument was devoted to the evidence in aggravation, Humphries’s lack of character, the absence of mitigating evidence in the case, and an explanation how these facts, along with the victim-impact evidence, warranted the imposition of a death sentence.
To be sure, the portion of the solicitor’s argument dealing with Dickie Smith’s unique personal characteristics is contained in less than four pages of an approximately twenty-eight page transcript of the solicitor’s closing argument and, during this segment of the solicitor’s closing argument, Humphries is mentioned just four times. Further, after the solicitor made his final reference to Humphries in his year-by-year chronology by telling the jury that in 1988 Humphries “went to jail for two years,” the solicitor followed two sentences later with the reminder to the jury that it had “the right to look at the uniqueness of the individual.” The solicitor then added that “Dickie Smith, by everybody’s description to you was a unique individual.” Moreover, the solicitor essentially concluded his argument by asking the jury to impose a sentence of death because: (1) the evidence in aggravation *221 was overwhelming; (2) there was a complete lack of mitigating evidence; (3) Hum-phries’s character was poor; and (4) “somebody like Dickie Smith [was] taken.” The solicitor’s closing argument, as outlined above, simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries. Rather, the solicitor invited the jury to consider all of the evidence in the record in reaching its verdict. That being the case, it cannot be said that the South Carolina Supreme Court unreasonably applied Payne to the facts of this case.
Second, the solicitor’s life history comparison contained in the year-by-year chronology was based upon facts established during the trial and were aspects of the trial which were readily apparent to the jury. Indeed, the circumstances of Dickie Smith’s life and the impact of his death on his family were thoroughly presented without contemporaneous objection through the testimony of Randy and Pat Smith. The circumstances of Humphries’s upbringing were thoroughly explored by Humphries’s counsel in the thirteen witnesses called by the defense. Because the solicitor’s life history comparison contained in the year-by-year chronology was based on evidence already before the jury, it is hard to take issue with the South Carolina Supreme Court’s conclusion that Hum-phries was not prejudiced by the solicitor’s comments.
Third, the facts concerning Humphries’s character referred to by the solicitor in his comparison were already thoroughly recounted in greater detail in an earlier portion of the solicitor’s closing argument. No objection, even to this date, is -being raised concerning this earlier portion of the solicitor’s closing argument. As noted above, the solicitor’s life history comparison set forth in the year-by-year chronology contained the following facts relating to Humphries: (1) he “committed two house break-ins at age 13”; (2) in 1986 he violated the terms of his probation and was “sent down to Columbia ”; and (3) in 1988 he went to prison for two years. Earlier, however, the solicitor had mentioned that Humphries had, at age thirteen, “committed two breaking and enterings” and was placed on probation. The solicitor pointed out that, because Humphries continued to be disobedient in school, he was brought before the family court on a probation violation and was released with stricter conditions imposed. The solicitor added that, at age fifteen, Humphries violated the terms of his probation and was “sent down to Columbia.” The solicitor also proffered that, at age sixteen, Humphries was “an habitual truant,” who “basically drop[ped] out of school.” The solicitor further noted that, at age seventeen, Hum-phries burglarized a church. The solicitor noted that, at age eighteen, Humphries went to Alabama and committed a larceny for which he was convicted and imprisoned for two years. Finally, the solicitor noted that, upon his release, Humphries failed to report to the probation office, a warrant was issued, and. within a couple of years of his release from prison he committed the murder at issue. Because all of the facts concerning Humphries referred to by the solicitor in his year-by-year chronology were facts recounted in greater detail earlier in his closing argument, it is difficult to conclude that the South Carolina Supreme Court acted unreasonably when it concluded that Humphries was not in any way prejudiced by the portion of the solicitor’s argument related to the unique character of Dickie Smith.
Fourth, Humphries’s attack on the three statements made by the solicitor near the end of the solicitor’s argument misses the mark. The statements were proper argument because the statements simply asked *222 the jury to focus on Dickie Smith’s uniqueness. Unquestionably, the solicitor was entitled to argue that Dickie Smith was unique. Moreover, the solicitor equally was entitled to ask the jury to “look” at Dickie Smith’s uniqueness and to ask the jury to consider the consequences of “when” a person of Dickie Smith’s uniqueness is “taken.”[6]
Fifth, the evidence in this case concerning the appropriate sentence was not close. The evidence showed that, after Hum-phries and Eddie Blackwell entered the Max-Saver convenience store, Dickie Smith asked Humphries whether he wanted something hot, and Humphries flashed a stolen gun and replied that he wanted money. While there was evidence that Dickie Smith reached under a counter as though to pull out a gun, Humphries shot Dickie Smith in the head, killing him. This evidence clearly supported the aggravating factor in the case, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon. The evidence in mitigation proffered by Humphries to counteract the evidence in aggravation was carefully and meticulously attacked by the solicitor. Moreover, that Dickie Smith was a unique person is not subject to serious debate. In short, we harbor no doubt that, notwithstanding the solicitor’s comparison that Humphries finds so objectionable, a sentence of death would have resulted.
Sixth, the reasonableness of the South Carolina Supreme Court’s decision in this case becomes more evident when one examines that court’s recent decision in Hall v. Catoe, 360 S.C. 353, 601 S.E.2d 335 (2004). In Hall, the solicitor directed the jury to weigh the worth of Hall’s life against the lives of Hall’s victims:
I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two girls were] worth, but nevertheless it is a question of values. What are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps.
Id. at 339. Hall argued that his trial counsel’s failure to object allowed “the solicitor to charge the jury with an arbitrary, misconceived sentencing analysis,” violating his right to due process. Id. The South Carolina Supreme Court agreed.
Applying Payne, the South Carolina Supreme Court held that the Hall case was distinguishable from the Humphries case:
In Humphries we recognized that it is more prejudicial for the state to compare the worth of the life of the defendant with that of his victim than it is to compare their lives based on the evidence presented.... In the present case, the solicitor not only suggested that Hall’s life was worth less than his victims’, he developed an arbitrary formula whereby if the jury finds Hall’s life worth less than his victims’, then the jury could reach no other conclusion than that the death penalty is justified. Further, while the solicitor in Hum-phries compared the histories of Hum- *223 phries’s and his victim’s lives, the solicitor in Hall - asked the jury to compare the worth of Hall’s life with that of his victims’.
Id. at 341.
In our view, the Hall court gave a principled- explanation of why the circumstances of Hall were distinguishable from those involved in our case. The Hall court indicated that Hall involved a direct “value” comparison between the defendant and the victim, asking the jury to- weigh the relative worth of the defendant and the victim. This comparison, the court concluded, rendered Hall’s trial fundamentally unfair. By contrast, the court concluded that the solicitor in Humphries simply compared the “histories” of the defendant and the victim’s lives “based on the evidence presented,” id., and thus, Hum-phries’s trial was not fundamentally unfair. In essence, the court in Hall evaluated the role that the solicitor’s argument played in both Hall and Humphries and reasonably concluded one was constitutionally proper and the other was not.
Finally, the reasonableness of the South Carolina Supreme Court’s decision in this case is illustrated by examining the words of the Payne case itself. Payne tells us that states have a legitimate interest in introducing evidence of a victim’s personal characteristics and evidence of the harm caused to the victim’s family and society by the defendant’s actions to counteract the mitigating evidence presented by the defendant. 501 U.S. at 825, 111 S.Ct. 2597. The Payne Court was quite explicit in this regard when it stated that the “State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family.” Id. (citation and internal quotation marks omitted). Whether the victim-impact evidence counteracts the defendant’s mitigating evidence is a question, asking the jury to make a comparison between the victim-impact evidence and the defendant’s mitigating evidence; In this case, in determining the appropriate sentence, the jury was asked to consider Dickie Smith’s personal characteristics, the harm caused to his family and society by Humphries’s actions, and Hum-phries’s mitigating evidence, which included evidence of Humphries’s personal characteristics, both favorable and unfavorable. Under these circumstances, it was reasonable for the South Carolina Supreme Court to conclude that the solicitor’s life history comparison contained in his year-by-year chronology and the solicitor’s other comments concerning Dickie Smith’s uniqueness were within the boundaries of a question the jury was required to consider — the blameworthiness of Humphries. ■
D
While paying lip service to the correct standard of review, which we all seem to agree presents Humphries with an extremely difficult hurdle to overcome, the dissent in this case simply does not apply it. For if it did, it most assuredly would reach a different result. An analysis of the dissent makes this point pellucid.
The dissent begins by characterizing the solicitor’s closing argument as one in which the solicitor asked for a death sentence because Dickie Smith’s life was worth more than Humphries’s life. The dissent tells us how the solicitor’s “climactical flourish,” post at 248, “baldly compared the general worth of the victim’s existence with that of the defendant and urged the jury to impose a death penalty,” post at 235, because Dickie Smith’s life was worth more than Humphries’s life. In character *224 izing the solicitor’s argument in this light, the dissent improperly ignores the fact that the South Carolina Supreme Court determined that the solicitor’s argument did not involve a comparison of the relative worth of the lives of Dickie Smith and Humphries. Under § 2254, our duty is not to determine in the first instance if the solicitor’s argument involved a relative worth comparison, but rather to decide whether the South Carolina Supreme Court was unreasonable when it determined that the solicitor’s argument did not involve such a comparison. The dissent utterly fails to carry out this duty.
Before turning its attention to Payne, the dissent criticizes us for our inability “to point to no other argument that even approaches the egregiousness of this prosecutor’s comments and no other case in which a court has tolerated such misconduct.” Post at 236. In serving up this critique, the dissent proceeds to discuss several state cases which have addressed Payne. Obviously, our review under § 2254 does not require us to find or rely on a state ease which has upheld a similar prosecutorial argument. Rather, our standard of review simply asks us to determine whether the South Carolina Supreme Court unreasonably applied clearly established United States Supreme Court precedent.[7]
Next, the dissent turns its attention to Payne. According to the dissent, Payne specifically holds that all comparative worth arguments are unconstitutional. The fallacies in the dissent’s interpretation of Payne are obvious.
The Payne Court did not hold that all comparative worth arguments are unconstitutional. At most, the Payne Court disapproved of comparisons between the victim and other victims of society. 501 U.S. at 823, 111 S.Ct. 2597. Indeed, the Court’s only relevant reference to comparative worth arguments is the following:
Payne echoes the concern voiced in Booth’s case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. ... As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind — for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not.
Id. (emphasis added). Thus, the Payne Court was careful to note that victim-impact evidence is not offered to encourage comparative judgments involving the victim and other victims in society. More importantly, the Payne Court did not disapprove of comparisons between the defendant and the victim.[8] In view of this, it *225 is inconceivable to conclude that the South Carolina Supreme Court unreasonably applied Payne.
The dissent also tells us that a search of the Payne opinion “for any indication that the Court meant to condone” comparative worth arguments would be “in vain.” Post at 242. However, our task under § 2254 is not to determine whether Payne condones some, or even all, comparative worth arguments; rather, our task is to determine whether the South Carolina Supreme Court was unreasonable when it determined that Payne did not prohibit victim-to-defendant comparisons and whether the court was unreasonable when it determined that the solicitor’s closing argument did not render Humphries’s trial fundamentally unfair.
Moreover, the Payne Court recognized that some comparisons would be made between the defendant and the victim. 501 U.S. at 825, 111 S.Ct. 2597. Indeed, the Payne Court noted that the “State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sen-tencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family.” Id. (citation and internal quotation marks omitted). Obviously, it was reasonable for the South Carolina Supreme Court to conclude that, to counteract Humphries’s mitigating evidence, the solicitor was allowed to introduce evidence concerning Dickie Smith’s uniqueness and the actions Humphries chose to take during the course of his life.
When all is said and done, the issue before this court is unmistakably narrow. The issue is not whether we think all comparative worth arguments are unconstitutional or only those involving victim-to-victim comparisons. Nor are we called upon to determine if there are shortcomings in the Payne framework.[9] Finally, whether our faithful application of § 2254 leads us on the path toward “totalitarianism],” post at 249, obviously is, as a politically philosophical proposition, beside the point. We, as an inferior court, simply are not at liberty to ignore our solemn constitutional responsibility to faithfully apply the law by converting the applicable deferential § 2254 standard of review to the de novo standard, as the dissent, through legal alchemy, necessarily does throughout its opinion. Put simply, because the South Carolina Supreme Court identified the correct legal standard from the Supreme Court’s decision in Payne, we must decide whether the South Carolina Supreme Court unreasonably applied the Payne decision. Williams v. Taylor, 529 U.S. at 413, 120 S.Ct. 1495. In this case, the South Carolina Supreme Court thor *226 oughly explained why it concluded that the solicitor’s comparison of Humphries’s life to that of Dickie Smith’s did not render Humphries’s trial fundamentally unfair. We know from our review of Payne and other relevant Supreme Court authority that comparisons between the defendant and the victim are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant’s mitigating evidence and the victim-impact evidence. Some comparisons, such as those based on race or religion, unquestionably are unconstitutional. See Zant v. Stephens, 462 U.S. 862, 865, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (noting that a defendant’s race and/or religion are “totally irrelevant” to the sentencing process). Other comparisons are not. The South Carolina Supreme Court was required to decide if the solicitor’s comparison of Humphries’s life history to Dickie Smith’s life history was violative of the dictates of Payne. After reviewing that court’s thorough opinion, we simply cannot conclude that the South Carolina Supreme Court unreasonably applied the Payne decision.
IV
Humphries also claims that the State’s failure to notify him prior to trial of the State’s intended use of victim-impact evidence during the sentencing phase of the trial violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. On direct appeal, the South Carolina Supreme Court rejected this claim.
Humphries first posits that his trial counsel reasonably believed that South Carolina Code § 16-3-20(B) entitled the defense to receive pre-trial written notice of the aggravating factors that would be used at the sentencing phase of the trial, which implicitly included victim-impact evidence. According to Humphries, his trial counsel did not receive pre-trial notice of the intended use of victim-impact evidence and, had such notice been given, his trial counsel would have used different trial tactics, including, among other things, selecting jurors differently and reconfiguring an expert witness’s testimony. Humphries suggests that the State’s failure to comply with § 16-3-20(B) violated his federal due process rights.
For several reasons, Humphries’s reliance on § 16-3-20(B) is misplaced. First, Humphries is raising an issue of state law, which is not cognizable on federal habeas review. Cf. Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (“[Federal habeas corpus relief does not lie for errors of state law.”). Second, the statute at issue does not require that notice of the use of victim-impact evidence be given. South Carolina Code § 16-3-20(B) provides that at the sentencing phase of the trial “[o]nly such evidence in aggravation as the State has informed the defendant in writing before the trial is admissible.” S.C.Code Ann. § 16-3-20(B). The South Carolina Supreme Court on direct appeal noted that the statute lists certain aggravating factors requiring notice. Humphries, 479 S.E.2d at 55. Because victim-impact evidence is not listed as an aggravating factor, the State is not required to give notice. Id. Finally, even if the statute did require pretrial notice, Humphries received pre-trial written notice that the State intended to introduce certain facts in evidence including all circumstances surrounding the commission of the crimes. In its witness lists, the State listed the victim-impact witnesses and, moreover, the State asserted that it had informed the defense that it would present victim-impact evidence during the sentencing phase of the trial. While the pre-trial notice could certainly have been more explicit concerning the *227 planned introduction of victim-impact evidence, unquestionably, the State was not obligated under § 16-3-20(B) to detail the victim-impact evidence with greater specificity.
In a related argument, Humphries claims that his due process rights were violated because his death sentence “was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.” Gardner, 430 U.S. at 362, 97 S.Ct. 1197. According to Humphries, he did not receive adequate notice concerning the introduction of victim-impact evidence and, therefore, could not adequately prepare his defense in advance. This claim founders for the simple reason that Humphries knew or reasonably should have known that victim-impact evidence would be used by the State during the sentencing phase of the trial. Therefore, he had ample opportunity to investigate and rebut that evidence. Indeed, there is no law that clearly requires timely, specific, and express notice of victim-impact evidence, and Humphries can point to no relevant federal authority to substantiate his claim. Thus, the South Carolina Supreme Court reasonably interpreted federal law to find that the admission of victim-impact evidence did not violate Humphries’s right to a fair trial under the Due Process Clause of the Fourteenth Amendment.
V
For the reasons stated hérein, the judgment of the district court is affirmed.

AFFIRMED

. Initially, Humphries named Gary Maynard, former commissioner of the South Carolina Department of Corrections, and Charles Con-don, South Carolina’s former attorney general, as respondents. Now, Jon Ozmint and Henry McMaster, respectively, hold these positions and have been substituted as respondents, Fed.R.Civ.P. 25(d)(1). For ease of reference, we will refer to respondents as "the State" throughout this opinion.

. The unfortunate circumstances of Hum-phries’s upbringing were further confirmed by the testimony of two other witnesses, Ruby Badsen, Humphries's maternal grandmother, and Lindsay Badsen, Humphries's uncle.

. The jury was presented with one aggravating circumstance (murder committed during *212 the commission of a robbery while armed with a deadly weapon) and two statutory mitigating circumstances (no significant prior criminal history and the age of the defendant). The jury was also instructed to consider any other circumstances it found to be mitigating.

. For the other counts of conviction, Hum-phries received concurrent twenty-year sentences.

. Within the year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) "Dickie Smith is as much about this case as ... Humphries”; (2) *220 Humphries "committed two house break-ins at age 13"; (3) in 1986 Humphries violated the terms of his probation and was "sent down to Columbia”; and (4) in 1988 Hum-phries went to prison for two years.

. We note that a consequence of Payne is that a defendant can be put to death for the murder of a person more "unique” than another, even though the defendant is, in fact, unaware of the victim's uniqueness. This does give us some pause for concern, as does the notion that, under Payne, a sentence of death can turn on the severity of the harm caused to the victim’s family and society, even though the defendant did not know the victim or the victim's family. However, these are inevitable consequences of Payne's comparative framework; a framework that we, as judges of an inferior court, are without liberty to change.

. Even if we have to accept the dissent’s distorted invitation to cite precedent other than clearly established Supreme Court precedent, cases more egregious than the one before this court do exist. For example, in State v. Ha-selden, the prosecutor told the jury that "[i]f you let this murderer walk out of this courtroom with his life then you are saying that his life is worth more than [the victim’s] life.” 357 N.C. 1, 577 S.E.2d 594, 610, cert. denied, 540 U.S. 988, 124 S.Ct. 475, 157 L.Ed.2d 382 (2003). The Haselden court upheld this argument under Payne because the argument: (1) “simply reminded the jury that in addition to considering defendant’s life, the jury should also consider the life of the victim"; and (2) "was a natural and proper extension of the prosecutor’s earlier argument concerning victim impact evidence.” Id. Thus, the Haselden court upheld the prosecutor's argument even though, unlike this case, the prosecutor explicitly and unmistakably implored the jury to weigh the comparative worth of the defendant and his victim.

. In view of the framework established in Payne, the Payne Court's decision to refrain *225 from commenting on victim-to-defendant comparisons is easily understood. A victim-to-victim comparison is more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant's mitigating evidence, which was one of the main goals of Payne.

. Arguably, Payne has a few shortcomings. For example, a consequence of Payne is that a defendant can be put to death for the murder of a person more "unique” than another, even though the defendant was, in fact, unaware of the victim's uniqueness at the time of the crime. Also, under Payne, a sentence of death can turn on the severity of the harm caused to the victim’s family and society, even ' though the defendant did not know the victim or the victim’s family. Whether we agree or disagree with these consequences simply is beside the point. These consequences are inevitable under the Payne framework; a framework that we, as judges of an inferior court, are without liberty to change.